UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ALBERT G ELLIS, II, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-02015-JPH-MG |
| | ) |
| MARION COUNTY SHERIFFS OFFICE, | ) |
| | ) |
| Defendant. | ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Albert Ellis alleges that the Marion County Sheriff's Office ("MCSO") violated the Americans with Disabilities Act when it terminated his employment based on the results of a medical evaluation. MCSO has moved for summary judgment. For the reasons below, that motion is **GRANTED**. Dkt. [44].

**I.
Facts and Background**

Because MCSO moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

On July 15, 2021, Mr. Ellis accepted a conditional offer of employment with MCSO to be a jail control operator ("JCO"). Dkt. 45-4 at 2, 5; dkt. 45-2 at 79. As part of their assigned duties, JCOs monitor "closed circuit television camera screens for evidence of security breaks and violation of Jail rules," assure "doors are properly secured and locked," control "security of an access through electronic doors," and "observe[] and communicate[] with inmates who

1

claim to be ill [to] summon[] indicated assistance," though they do not have physical contact with inmates.  Dkt. 45-2 at 79.  The "sensitive and important" nature of the JCO position requires that MCSO "select individuals who possess the best physical, mental, moral, and emotional character," as JCOs encounter "critical and dangerous situations" in the jail.  *Id.* at 56, 59.

Mr. Ellis then underwent a medical and psychological evaluation on August 12.  Dkt. 46 at 1.  The exam was conducted by Public Safety Medical, the third-party occupational medicine group contracted by MCSO and other Marion County public safety agencies for medical evaluations.  Dkt. 45-4 at 2; dkt. 45-1 at 3.  During the examination, Mr. Ellis told the Public Safety Medical evaluator that he could reduce the amount of oxycodone and methadone that he took.  Dkt. 45-2 at 45.[1]

The next day, on August 13, MCSO extended a second conditional offer to Mr. Ellis.  Dkt. 45-4 at 2.  That offer required Mr. Ellis to "[s]uccessfull[y] pass the medical evaluation" and informed him that "[f]ailure to pass will result in immediate dismissal from the academy."  *Id.* at 7.  It also included an acknowledgment stating:

> Successful compliance with these job related and necessary conditions of employment is required to carry out the essential functions of the above position.  I have read and understand the terms of this CONDITIONAL OFFER OF PROBATIONARY EMPLOYMENT.

---

[1] Before Public Safety Medical finalized its report, it contacted the nurse practitioner who prescribed Mr. Ellis's oxycodone and methadone.  *Id.* at 46.  The nurse practitioner declined to provide an opinion on Mr. Ellis's fitness for the JCO position.  The parties dispute whether this statement is inadmissible hearsay and, if it is not, how the nurse's response should be interpreted.

2

*Id.*

Mr. Ellis successfully completed the classroom portion of JCO training on August 30 and thereafter began field training at the jail. Dkt. 45-2 at 29. On September 14, Public Safety Medical submitted its medical evaluation to MCSO. Dkt. 46 at 1. The evaluation stated that Mr. Ellis was "not recommended" for employment with MCSO. *Id.* at 2. In support of this recommendation, the evaluation cited the potential side effects of methadone and oxycodone, which Mr. Ellis was taking for pain management:

> Possible side effects from these medications include but are not limited to drowsiness, lightheadedness, forgetfulness and impaired cognition. While not all users of these medications experience all these side effects, the risk of developing any of these side effects in a safety sensitive position such as this one makes the requirement for use of these medications a contraindication for this position and as such this applicant is not recommended. If at some point in the future he no longer requires use of ongoing narcotic medication for maintenance of his medical condition, he can be reconsidered for this position.

*Id.* at 1.

Mr. Ellis received a letter on September 17 stating that his employment with MCSO was being terminated, effective immediately, based on his medical evaluation. Dkt. 45-2 at 28, 78. The letter reiterated that Mr. Ellis's employment at MCSO had been conditioned on passing the medical evaluation. *Id.* at 78 ("[Y]ou were hired as a Jail Control Operator, pending successful completion of the medical evaluation.").

The next day, Mr. Ellis met with MCSO Lieutenant Kathy Archey and Director of Human Resources Denise Baker. Dkt. 45-4 at 1–3; dkt. 45-5 at 1–2. In that September 18 meeting, Mr. Ellis asked if MCSO had other positions

3

available that he could work in while taking his medications. Dkt. 45-2 at 43–44. He also told them that he could take different medications and not bring his medication with him to work. *Id.* at 44. Mr. Ellis also requested that MCSO contact his primary physician to learn more about Mr. Ellis's history of taking narcotics and his use of a non-narcotic drug while working as a hospital security guard nine years prior. *Id.* at 46–47. Ms. Baker and Lt. Archey told Mr. Ellis they would "let him know." *Id.* at 44–45. Later, Ms. Baker informed Mr. Ellis that there was "not another position with MCSO" available at that time. Dkt. 45-4 at 9.

Mr. Ellis filed this case alleging that MSCO violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, when it did not attempt to accommodate his medical condition and then terminated his employment. Dkt. 1. MCSO has moved for summary judgment. Dkt. 44.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

## III.
## Analysis

Mr. Ellis brings two ADA claims, one for disability discrimination and the other for failure to accommodate his disability. While the two claims are distinct, to succeed on either Mr. Ellis must show that he was a qualified individual.[2] *See Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 995 (7th Cir. 2024). MCSO argues that it is entitled to summary judgment because, among other reasons, Mr. Ellis cannot show that he was a qualified individual. Dkts. 48, 56. As explained below, the Court's analysis begins and ends with that issue.

"At summary judgment, it is the plaintiff's burden to provide evidence such that a rational jury could find her to be a qualified individual," meaning that she "can perform the essential functions of the employment position either with or without reasonable accommodation." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020) (quoting 42 U.S.C. § 12111(8)); *see also Li*, 110 F.4th at 995; *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 418 (7th Cir. 2016) (quoting *Basden Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013)). It's not enough to "rel[y] upon a conclusory and untested opinion/hope that the proposed treatment/accommodation would enable them

---

[2] The Court assumes for the sake of this analysis that Mr. Ellis was disabled.

to perform the essential functions of their jobs." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289 (7th Cir. 2015).

Here, MCSO argues that Mr. Ellis was not a qualified individual for the JCO position, a "security sensitive position involving critical and dangerous situations." Dkt. 48 at 17 (citing dkt. 45-2 at 30). Further, a JCO "is responsible for the security of the jail and the care of the inmates in the jail and, therefore, needs to be alert and cognitively sharp." *Id.* Considering these demands, MCSO argues that Mr. Ellis was not qualified for the JCO position because of "the potential side effects" from methadone and oxycodone. *Id.*

Mr. Ellis responds that he could have performed the JCO position's essential functions with reasonable accommodations. Dkt. 52 at 11–12. Mr. Ellis designates the following evidence:

- A passage from Public Safety Medical's medical examination report stating he could be reconsidered for a JCO position if he stopped taking methadone and oxycodone.
- His conversation with Lt. Archey and Ms. Baker the day after his termination during which he told them that he was willing to switch medications or stop taking methadone and oxycodone and that he had used a non-narcotic drug while working as a hospital security guard nine years prior.
- His request to Lt. Archey and Ms. Baker to contact his primary physician and his medical evaluator's discussion with the nurse practitioner who prescribed methadone and oxycodone to him.

6

Dkt. 52 at 3–5, 11–12.

As legal authority, Mr. Ellis relies on *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014), and *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958 (7th Cir. 2014). In *Spurling*, the plaintiff designated evidence that after she was fired, she obtained additional medical testing showing that her narcolepsy was "manageable with proper medication." 739 F.3d at 1059, 1062. The court concluded that this designated evidence showed that the plaintiff was a qualified individual, triggering the defendant's obligation to engage plaintiff in an interactive process to determine a reasonable accommodation. *Id.* at 1062. And in *Kauffman*, the plaintiff designated evidence that her doctor instructed her post-surgery to refrain from pushing nursing home residents in wheelchairs to prevent further injury. 769 F.3d at 962–63. The court held that a question of fact existed as to whether pushing residents in wheelchairs was an essential function of the job. *Id.* If it was not, plaintiff could be a qualified individual despite the post-surgical limitation that prevented her from pushing residents in wheelchairs.

*Spurling* and *Kauffman* show that specific, designated evidence related to a plaintiff's qualifications may create a contested issue of fact as to whether a plaintiff can perform the essential functions of a job while conclusory and untested opinions do not. The plaintiff must offer non-speculative evidence from which a reasonable jury could conclude he could perform the essential functions of the position with a reasonable accommodation.

In *Weigel v. Target Stores*, for example, the court found that an affidavit from the plaintiff's psychologist stating there was a "good chance" she could return to work with treatment was "too conclusory and uninformative" to show the plaintiff was a qualified individual. 122 F.3d 461, 468–69 (7th Cir. 1997). Similarly, in *Basden* the court affirmed summary judgment for the defendant employer because the plaintiff, a railroad dispatcher who had multiple sclerosis, failed to "present medical evidence regarding the effectiveness of her treatment," despite having shown that medication "improved her condition." 714 F.3d at 1038. And in *Stern,* a report from plaintiff's doctor expressing "hope" that he could overcome memory difficulty and that with adjustments to duties he could "possibly" perform his duties effectively, was too speculative. 788 F.3d at 289.

Distinguishing *Spurling*, the court in *Stern* noted that the plaintiff "could have sought additional medical treatment or testing after his discharge, as the plaintiff in *Spurling* did, and could have obtained non-speculative, non-conclusory evidence that a proposed accommodation or treatment would have allowed him to adequately perform the essential functions of the job," but did not do so. *Id.* at 289. The key inquiry is therefore whether the plaintiff has designated concrete and specific evidence of the ability to perform the essential functions of the job—evidence that is conclusory and untested will not suffice. *See Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001) (concluding plaintiff's "bare assertion" about accommodation's potential effectiveness was "sheer speculation").

8

Mr. Ellis's designated evidence—his own testimony that if he stopped taking the methadone and oxycodone or switched medications he could stay alert consistently—isn't like the specific evidence designated by plaintiffs in *Spurling* and *Kauffman* that created a contested issue of material fact. Instead, it's more like the evidence designated by the plaintiffs in *Stern*, *Weigel*, and *Basden* that was found too speculative and conclusory to create a contested issue of material fact. In *Spurling*, the additional medical testing plaintiff underwent after her termination revealed that her narcolepsy could be managed with proper medication. 739 F.3d at 1062. Here, in contrast, Mr. Ellis does not designate evidence showing that he was unlikely to experience the severe side effects associated with methadone and oxycodone; that he could perform the essential functions of the JCO position without any medication to manage his pain; or that his pain could be effectively managed with alternative medications that do not have similar side-effects. So, even if Mr. Ellis changed his medication regimen, he did not "present medical evidence regarding the effectiveness of [this] treatment" in minimizing the potential disqualifying side effects. *Basden,* 714 F.3d at 1038.

In an attempt to overcome this problem, Mr. Ellis designates evidence that he was able to work as a hospital security guard nine years ago by taking a non-narcotic medication. Based on this evidence, he argues that he could have worked as a JCO by taking different prescription drugs that do not have the potential side-effects of oxycodone and methadone. Mr. Ellis's work as a hospital guard, however, is too remote in time to have much probative value in

9

determining whether Mr. Ellis could have worked as a JCO in 2021.  Moreover, Mr. Ellis does not designate evidence regarding the specific qualifications for and duties of the hospital guard position in comparison to the JCO position.  Similarly, he does not designate evidence showing that the same non-narcotic medications he took nine years earlier could effectively treat the health conditions he had in 2021.  In short, it would be speculative to find from Mr. Ellis's previous experience working as a security guard at a hospital that he was a qualified individual for the JCO position.  *See Basden*, 714 F.3d at 1038.

      Mr. Ellis also cites the medical-evaluation report and the evaluators' discussion with Mr. Ellis's prescribing nurse practitioner, but that evidence fares no better.  The report made no finding about what would happen if Mr. Ellis changed his medication regimen and concluded only that he could "be reconsidered" for the position if he stopped taking narcotic medications.  Dkt. 46 at 1.  That is no more concrete than the affidavit in *Weigel* stating the plaintiff had a "good chance" of returning to work with treatment, which the court found to be "too conclusory and uninformative."  122 F.3d at 468–69.  And the prescribing nurse declined to opine on whether Mr. Ellis could perform the JCO position's essential functions.  Dkt. 45-2 at 45–46.  The statements in the report and made by the prescribing nurse are speculative and untested, and therefore not enough to show that Mr. Ellis could have performed the JCO position's essential functions with a reasonable accommodation.  *See Stern*, 788 F.3d at 289 (finding medical evaluator's "speculative, untested suggestions were not adequate" to meet plaintiff's "reasonable accommodation" burden).

10

Taken all together, Mr. Ellis's designated evidence is no more than a "conclusory and untested opinion/hope" that he could perform the JCO position's essential functions. *Id.* In response to a summary judgment motion that's supported with designated evidence, that's not enough—his burden is to designate non-speculative evidence showing that he could perform the JCO position's essential functions with reasonable accommodation. *Id.*; *Weigel*, 122 F.3d at 468–69; *Basden*, 714 F.3d at 1038. He has not done so.

Finally, the JCO position's safety-sensitive nature further supports the conclusion that a reasonable jury could not conclude Mr. Ellis was a qualified individual. "[I]t is entirely proper for an employer assessing the reasonableness of a proposed accommodation to consider the sensitive nature of the employee's position and the potential safety and liability risks involved." *Stern*, 788 F.3d at 295. MCSO designates evidence that JCOs need "to be alert and cognitively sharp" because they face "critical and dangerous situations" and are "responsible for the security of the jail and the care of the inmates in the jail." Dkt. 48 at 17 (citing dkt. 45-2 at 30, 35–36, 56, 59, 79; dkt. 46). And the designated evidence reflects that Public Safety Medical's evaluation, which MCSO relied on, explicitly considered the JCO position's safety-sensitive nature in reaching its conclusion to not recommend Mr. Ellis for further consideration to be hired as a JCO. Dkt. 46 at 1 ("[T]he risk of developing any of these side effects in a safety sensitive position such as this one makes the requirement for use of these medications a contraindication for this position . . . .").

In other cases involving safety-sensitive positions, the Seventh Circuit has held there was no triable issue of fact as to whether the plaintiffs were a qualified individual. *See Stern*, 788 F.3d at 295 (acute-care psychologist with significant memory impairment); *Emerson v. N. States Power Co.*, 256 F.3d 506, 513 (7th Cir. 2001) (phone operator prone to anxiety attacks who answered "safety-sensitive calls" regarding gas and electrical emergencies for 5–10% of the workday). That makes sense considering that "[t]he ADA does not require an employer to walk on a razor's edge—in jeopardy of violating the ADA if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone." *Palmer v. Cir. Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (cleaned up). MCSO could therefore weigh the potential side effects of Mr. Ellis's prescription medications against the JCO position's safety-sensitive nature without running afoul of the ADA. Given the safety-sensitive nature of the JCO position and the potential side-effects of the prescription drugs that Mr. Ellis was taking, no reasonable jury could find that Mr. Ellis was a qualified individual under the ADA.[3]

Mr. Ellis also argues that the MCSO's use of the medical examination violated the ADA because MCSO "did not learn the *results* of that examination until roughly four weeks *after* [Mr. Ellis] commenced his duties." Dkt. 52 at 5–

---

[3] Mr. Ellis also argues that MCSO failed to engage an interactive process to determine a reasonable accommodation. Dkt. 52 at 12. Because Mr. Ellis cannot show that he was a qualified individual, the Court need not address whether MCSO engaged in an interactive process. *See Stern*, 788 F.3d at 293 (plaintiff "failed to produce adequate evidence that he is a qualified individual . . . . Therefore, this case falls into the category of cases in which an employer's alleged failure to adequately engage in the interactive process is immaterial.").

6. In response, MCSO argues that Mr. Ellis was "still in training" when MCSO fired him, so he was terminated before he "commence[d] his duties" as a JCO. Dkt. 56 at 2. But when Mr. Ellis began his JCO duties in relation to when the medical examination was conducted and when Mr. Ellis learned the results doesn't matter to the outcome here. MCSO's requirement that Mr. Ellis submit to a medical examination was permissible so long as it was job-related and consistent with business necessity. *O'Neal v. City of New Albany*, 293 F.3d 998, 1010 (7th Cir. 2002) (applying this standard when medical examination used to screen applicants who had received conditional offers); *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (applying this standard when medical examination given to current employee).

"An 'examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition.'" *Kurtzhals v. County of Dunn*, 969 F.3d 725, 730–31 (7th Cir. 2020) (quoting *Coffman*, 578 F.3d at 565). Public safety agencies like police departments have a "particularly compelling interest in assuring" that its employees in safety-sensitive positions are "both physically and mentally fit to perform [their] duties" since they are "responsible for public safety." *Id.* at 731; *see also id.* ("This special work environment necessitates greater leeway for supervisors to order job-related fitness-for-duty evaluations." (quotations omitted)).

13

MCSO argues that its medical examination is job-related and consistent with business necessity because it uses the exam to "evaluat[e] JCO applicants for medical and psychological conditions that could prevent those applicants from effectively doing their jobs" as JCOs. Dkt. 48 at 17. Such conditions included "drowsiness, lightheadedness, forgetfulness and impaired cognition." *See* dkt. 46 at 1. MCSO contends that it screens for those conditions because JCOs need "to be alert and cognitively sharp," as they face "critical and dangerous situations" in this "security sensitive position" and are "responsible for the security of the jail and the care of the inmates in the jail." Dkt. 48 at 17 (citing dkt. 45-2 at 30, 35–36, 56, 59, 79; dkt. 46). Mr. Ellis designates no contrary evidence. Accordingly, no reasonable jury could conclude that MCSO's use of the medical examination to decide whether Mr. Ellis would be offered employment violated the ADA. *See Kurtzhals*, 969 F.3d at 730–31 (affirming as job-related a fitness-for-duty evaluation of police officer who threatened coworker).

## IV. Conclusion

MCSO's motion for summary judgment, dkt. [44], is **GRANTED**. Final judgment shall issue by separate entry.

**SO ORDERED.**

Date: 5/1/2025

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

14